UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHERYL DEAVER,

          Plaintiff,

      v.

COMPASS BANK, et al.,

          Defendants.

Case No.  13-cv-00222-JSC

**ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

Re: Dkt. Nos. 75, 87, 89

In this pre-certification class action dispute, Plaintiff Cheryl Deaver alleges that, among other things, Defendants Compass Bank, Inc. ("Compass") and BBVA Compass Insurance Agency, Inc. ("BBVA") maintained and enforced unlawful practices and policies in violation of California wage and hour laws.  Now pending before the Court is the parties' joint motion for preliminary approval of a class action settlement.  (Dkt. No. 75.)  After reviewing the proposed settlement, with the benefit of oral argument on June 4, 2015 and post-hearing briefing, the Court GRANTS the motion as outlined below.

## BACKGROUND

Defendants, Texas and Alabama corporations, collectively doing business as "BBVA Compass" operate a chain of retail banking centers throughout California.  Plaintiff, a California citizen, worked for BBVA Compass as a non-exempt financial sales advisor.  Plaintiff's Revised Second Amended Complaint ("SAC2")  includes five causes of action under California law:  (1) failure to pay wages for hours worked in violation of California Labor Code Section 1194; (2) failure to provide meal periods or compensation in lieu thereof in violation of California Labor Code Sections 226, 226.7, 1174(d), and Section 11 of the IWC Wage Orders, and Cal. Code Regs., Title 8, section 11000 et seq.; (3) failure to timely pay wages due at termination in violation

United States District Court
Northern District of California

of California Labor Code Sections 21, 202, 203; (4) failure to provide accurate wage statements in violation of California Labor Code Section 226(a); and (5) violation of Unfair Competition Law, California Business and Professions Code Section 17200 et seq.  (Dkt. No. 66 ¶¶ 35-65.)

The case has a complicated and protracted procedural history, which is briefly summarized below.

Plaintiff initially filed suit in Riverside County Superior Court (the "Prior Action"). Pursuant to the Class Action Fairness Act ("CAFA") of 2005, *see* 28 U.S.C. §§ 1332(d), 1441, 1453, Defendants removed the Prior Action to the Central District.  (Case No. EDCV11-1489 PSG).  Plaintiff did not move to remand, and the case remained in federal court.  The parties thereafter stipulated to dismissal of the Prior Action without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), with each party to bear her or its own attorneys' fees and costs, and the court so ordered.  (*Id*. at 10-12.)  The stipulation did not contain any conditions or limitations on Plaintiff's ability to file the same, or a similar action, in the future.

Approximately four months after the stipulated dismissal of the Prior Action, Plaintiff filed the present putative class action complaint ("the Complaint") in Alameda County Superior Court. Defendants timely removed the Complaint on the ground that this Court has original jurisdiction under CAFA.  In their removal papers, Defendants performed calculations for each of Plaintiff's causes of action on a class-wide basis and determined that the total amount in controversy was $5,772,662.  However, as Plaintiff demonstrated in her motion to remand and as Defendants conceded, Defendants' original calculations contained errors that inflated the final amount above the $5,000,000 threshold.  Defendants corrected those errors in their subsequent calculations in their opposition to the motion to remand ("Opposition"), but in so doing, they also changed their approach to those calculations.  Initially, Defendants based their calculations on the allegations of the Complaint.  Upon realizing the errors in their calculations, however, Defendants changed their approach and based their amount in controversy calculations on the more detailed allegations from the Prior Action.  The Court determined that it could not consider Plaintiff's allegations in the Prior Action in determining whether Defendants had proved the requisite amount in controversy to a legal certainty.  (Dkt. No. 32 at pp. 5-6.[1])  Applying the legal certainty test to the allegations of

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the

2

1   the Complaint together with Defendants' evidence, the Court concluded that the amount in

2   controversy was not satisfied and remanded the case to Alameda County Superior Court.[2]

3        Pursuant to CAFA, Defendants timely filed a petition with the Ninth Circuit for permission

4   to appeal the remand order.  *See* 28 U.S.C. § 1453(c)(1).  While the petition was pending, the

5   Ninth Circuit overruled the legal certainty test of *Lowdermilk v. United States Bank National*

6   *Association*, 479 F.3d 994 (9th Cir. 2007), as a result of the United States Supreme Court's

7   decision in *Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345 (2013), and held that under CAFA

8   a removing defendant must satisfy the amount in controversy by a preponderance of the evidence.

9   *Rodriguez v. AT&T Mobility Servs. LLC,* 728 F.3d 975, 981-82 (2013).  *Rodriguez* also held that

10  in determining the amount in controversy courts "must necessarily 'look beyond the four corners

11  of the complaint' when the complaint alleges damages below the jurisdictional minimum."  *Id*. at

12  981.  In light of *Rodriguez*, Defendants again removed the action from the Alameda Superior

13  Court and the action was ultimately assigned to the undersigned judge.   N.D. Cal. Case No. 13-

14  cv-4598 (JSC).  Plaintiff then moved, again, to remand.  In the meantime, the Ninth Circuit

15  vacated the remand order and sent the case back to this Court for reconsideration in light of

16  *Rodriguez*.  The Court ultimately denied Plaintiff's first motion to remand concluding that

17  Defendants had established by a preponderance of the evidence that the amount in controversy

18  was $5,433,414.35, thus satisfying the CAFA jurisdictional requirements.[3]  (Dkt. No. 58 at 14.).

19  The Court also denied Defendant's motion to transfer venue to the Central District—the venue of

20  the Prior Action.  (*Id*. at 18.)  The Court, however, granted Defendant's motion to dismiss under

21  Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  (*Id*. at 19.)

22       Plaintiff thereafter filed her Second Amended Complaint and then the operative Revised

23  Second Amended Complaint.[4]  (Dkt. Nos. 59 and 66.)

United States District Court
Northern District of California

---

ECF-generated page numbers at the top of the documents.
[2]  In support of their claims of CAFA jurisdiction, Defendants provided extensive data regarding the size of the class, number of workweeks worked, average hourly rates for class members, percentage of full-time and part-time workers in the class; this evidence formed the basis for these calculations.  (Dkt. Nos. 4; 22-2; 22-3.)
[3]  Given the Court's conclusion that jurisdiction lay in federal court, the second removal action was dismissed as moot.  (Dkt. No. 58.)
[4]  Based on the stipulation of the parties, the Revised Second Amended Complaint omitted the Private Attorneys General Act of 2004 claim which had been added to the Second Amended Complaint.  (Dkt. No. 62.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### SETTLEMENT PROPOSAL

On December 10, 2014, the parties participated in a full-day mediation session with Mariam Zadech, Esq., an independent mediator with extensive experience in wage and hour class actions.  (Dkt. No. 89 at ¶ 4.)  In preparation for the mediation, Defendants provided Plaintiff with "over 426,000 lines of time entries (punch data) for the class, over 42,000 lines of wage data for the class, over 7,400 lines of meal period premium data for the class, job descriptions for the various positions in the class, handbooks/manuals containing the relevant policies and procedures, and hundreds of pages of documents that describe the policies and procedures at issue in the litigation (scheduling templates, checklists, reference guides, etc.)."  (Dkt. No. 75-1 at ¶ 13.)  Although the parties did not reach an agreement at the mediation, their negotiations continued and on January 16, 2015, the parties reached an agreement on the basic terms of the settlement.  (*Id*. at ¶¶ 15-16.)

Plaintiff submitted the parties' Joint Stipulation re: Class Action Settlement with her Motion for Preliminary Approval.  (Dkt. No. 75, Ex. 1 (pp. 28-64).)  Following a hearing on June 4, 2015, the parties filed an Amended Joint Stipulation Re: Class Action Settlement to address certain concerns raised by the Court.  (Dkt. No. 87.)  The Court thereafter requested additional briefing (Dkt. No. 87) and the parties submitted a Second Amended Joint Stipulation Re: Class Action Settlement (Dkt. No. 89) which modified the settlement and proposed notice to address the two concerns raised by the Court.  The key provisions of the revised settlement are set forth below.

### A.   Payment Terms

The parties' agreement provides a settlement fund of $500,000.  Reduced from that fund are (1) attorney's fees up to one-third of the fund ($166,665), (2) actual litigation costs of up to $20,000, (3) an enhancement award for the named Plaintiff of $7,500, (4) claims administration expenses up to $20,000, and (5) a $5,000 PAGA penalty, 75 percent of which shall be paid to the California Labor & Workforce Development Agency, and 25 percent shall be included in the net distribution to the class.  (Dkt. No. 89 at ¶ 18.)  The remaining funds are then distributed to the class members who do not opt out of the class.  Class members will receive a pro rata share of the

4

fund based on the number of workweeks worked.[5]  (*Id*. at ¶ 18(g).)  All checks to non-objecting class members not cashed within 90 days of mailing will escheat to the California Industrial Unclaimed Wages Fund.  No settlement funds will revert to Defendants.

**B.  Proposed Class**

The class is comprised of all current and former non-exempt branch employees of Defendant Compass Bank who are currently working, and/or who have worked in California during the period from August 22, 2009 to the date of preliminary approval of the settlement, in the following positions: Branch Associate, Senior Branch Associate I, Senior Branch Associate II, Associate Manager, Financial Sales Advisor II, Sr. Financial Sales Advisor, P & R Teller, Senior Teller, Business Class Teller, Customer Service Coordinator, Financial Sales Representative, Senior Financial Sales Representative and Senior Financial Sales Consultant, and who do not timely submit a Request for Exclusion.  (Dkt. No. 89 at ¶ 11.)  Defendants estimate that the class size is 911 individuals.  (Dkt. No. 89 at ¶ 6.)

**C.  Releases**

The scope of the release is as follows:

> Any and all of the claims asserted in this Action or which could have reasonably been asserted based on factual allegations asserted in the past and operative complaints in this Action, including:
> - Failure to Provide Meal Periods or Compensation in Lieu Thereof;
> - Failure to Pay Wages for Hours Worked as a result of alleged off-the-clock work;
> - Failure to Timely Pay Wages Due at Termination;
> - Knowing and Intentional Failure to Comply with Itemized Employee Wage Statement Provisions;

---

[5] The precise calculation is as follows:

> The Net Settlement Amount shall be divided by the number of aggregate Qualified Workweeks worked by all Class Members during the Class Period to produce a "Weekly Settlement Value." The number of "Qualified Workweeks" worked by each class member shall be determined by the length of each Class Member's employment with Defendant[s] during the Class Period, as a non-exempt branch employee in California. Each Class Member shall be eligible to receive a settlement payment in the amount of the total number of Qualified Workweeks worked by the Class Member multiplied by the Weekly Settlement Value, less applicable withholdings provided that the Class Member has signed and submitted a timely and valid Claim Form.

(Dkt. No. 89 at ¶ 18(g).)

- Violations of the Unfair Competition Law;
- Enforcement of Private Attorneys General Act of 2004 (Cal. Lab. Code section 2698, et seq.).

The Released Claims specifically include any and all items of alleged damage, interest or penalties sought in the complaints filed in the Action, including, but not limited to, claims for unpaid wages; meal and rest period premiums pursuant to California Labor Code section 226.7; interest; penalties (including waiting time penalties pursuant to California Labor Code section 203, wage statement penalties pursuant to California Labor Code section 226, and civil penalties pursuant to the Private Attorneys General Act of 2004 (California Labor Code sections 2698, et seq.)); claims pursuant to California Labor Code sections 200, 201, 202, 218.5, 226, 226.7, 510, 512, 558, 1174, 1194, 1197, 1198, and 1199; claims pursuant to the California Industrial Welfare Commission Wage Orders; claims under California Business and Professions Code sections 17200, et seq.; claims for attorneys' fees and costs, and/or unfair business practices for the time period from August 22, 2009 up to and including the date of preliminary approval of the Settlement.

(*Id.* at ¶ 15.)

### D. Procedure for Claims

Class Members will each be mailed a Claim Form which includes (1) the number of Qualified Workweeks worked by the Class Member during the Class Period and the estimated range of settlement awards according to Defendants' data, (2) the process by which this Class Member may contest the number of Qualified Workweeks worked during the Class Period; (3) the release language; and (4) a place to sign and date the form. (*Id.* at ¶ 20(d).)

### E. Deadlines

Following preliminary approval, Defendants have 15 days to provide the following data to the Claims Administrator: (1) the Class Member's Name, (b) the Class Member's last known address, (c) the last four digits of the Class Member's social security number; and (d) information necessary for the Claims Administrator to determine the number of Qualified Workweeks worked during the Class Period.  (*Id.* at ¶ 25.) The Claims Administrator then has 10 calendar days to mail a copy of the Claim Form and Notice.  (*Id.*)

Class Members have 75 days to return the Claim Form or evidence in writing their intent to opt out of the settlement  ("the Claims Receipt Deadline").  (*Id.* at ¶ 20(e).)  Written objections to the settlement are also due by the Claims Receipt Deadline. (*Id.* at ¶ 20(f).)

Within 15 days of the Effective Date (Final Approval) Defendants must deposit the total settlement amount into account maintained by the Claims Administrator.  (*Id.* at ¶ 30.)

Non-Objecting Class Members must cash their checks within 90 days of receipt of the check.  (*Id*. at ¶ 20(q).)

## DISCUSSION

A class action settlement must be fair, adequate, and reasonable.  Fed. R. Civ. P. 23(e)(2).  When, as here, parties reach an agreement before class certification, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  If the Court temporarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class will be notified and a final "fairness" hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Federal Rule of Civil Procedure 23.  *Villegas v. J.P. Morgan Chase & Co.*, No. 09-00261, 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

### A.      Conditional Certification of the Settlement Class

Class actions must meet the following requirements for certification:

> 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

In addition to meeting the requirements of Rule 23(a), a potential class must also meet one of the conditions outlined in Rule 23(b)—of relevance here, the condition that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In evaluating the proposed class, "pertinent" matters include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of

1    the claims in the particular forum; and

2        (D) the likely difficulties in managing a class action.

3    Fed. R. Civ. P. 23(b)(3).  Prior to certifying the class, the Court must determine that Plaintiffs have

4    satisfied their burden to demonstrate that the proposed class satisfies each element of Rule 23.

5                **1.    Rule 23(a)**

6        The Rule 23(a) factors are satisfied here.  First, the 911 member estimated class satisfies

7    the numerorsity requirement.  *See In re Rubber Chems. Antitrust Litig*., 232 F.R.D. 346, 350–51

8    (N.D. Cal. 2005) ("[w]here the exact size of the class is unknown but general knowledge and

9    common sense indicate that it is large, the numerosity requirement is satisfied," particularly where

10   the proposed "class is geographically dispersed" with "difficult to identify" members).  Second,

11   the common questions of law and fact center around BBVA's alleged uniform course of conduct

12   with respect to meal period policies and off-the-clock work which satisfies the commonality

13   requirement.  *See Bellinghausen v. Tractor Supply Co*., 303 F.R.D. 611, 616-17 (N.D. Cal. 2014)

14   ("divergent factual predicates with shared legal issues and a common core of salient facts coupled

15   with disparate legal remedies within the class can be sufficient").  Third, because the at-issue

16   policies are applied across the board, all non-exempt employees are alleged to have suffered

17   similar injuries with respect to failure to pay wages and penalties, thereby meeting the typicality

18   requirement.  *Id*. at 617 ("[t]he typicality requirement is satisfied here because Plaintiff alleges that

19   he, like the other class members, worked for Defendant in California during the class period and

20   was subjected to the same wage-and-hour policies and procedures at issue in this litigation.").

21   Finally, both Plaintiff and Class Counsel appear adequate.  Plaintiff was employed by Defendant

22   during the Class Period and has allegedly been injured in the same way as the Class Members.

23   *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594–95 (1997) ("[r]epresentatives must be part of

24   the class and possess the same interest and suffer the same injury as the class members.").  Class

25   Counsel has represented plaintiffs in numerous wage-and-hour class actions, *see* Dkt. Nos. 75-2 at

26   ¶ 6; 75-3 at ¶ 4; 86 at ¶ 8.  *See Andrews Farms v. Calcot, LTD.*, No. 07–0464, 2010 WL 3341963,

27   at *4 (E.D. Cal. Aug. 23, 2010) ("class counsel must be qualified, experienced, and generally able

28   to conduct the class action litigation.").

### 2.    Rule 23(b)(3)

Rule 23(b)(3) requires establishing the predominance of common questions of law or fact and the superiority of a class action relative to other available methods for the fair and efficient adjudication of the controversy.  *See* Fed. R. Civ. P. 23(b)(3).  Because of the common policies at issue here there are no predominance or superiority concerns.

#### a)    Predominance

Rule 23(b)(3) first requires "a predominance of common questions over individual ones" such that "the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996). This "inquiry focuses on the relationship between the common and individual issues." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (internal citation and quotation marks omitted).  In particular, the predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 594.

The core common questions in this case—the lawfulness of Defendants' policies and practices with respect to meal periods and off-the-clock work—predominate over any differences with respect to implementation of those policies and practices at particular branches.  As such, common questions of law and fact predominate.

#### b)    Superiority

A class action is a superior means of adjudicating a dispute "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino*, 97 F.3d at 1234.  In evaluating superiority, "courts consider the interests of the individual members in controlling their own litigation, the desirability of concentrating the litigation in the particular forum, and the manageability of the class action." *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 514 (N.D. Cal. 2007) *modified*, No. 05–04993 MJJ, 2007 WL 2220972 (N.D. Cal. Aug. 1, 2007), *aff'd sub nom. Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137 (9th Cir. 2009). There is no indication that members of the proposed class have a strong interest in individual litigation or an incentive to pursue their claims individually, given the small amount of damages likely to be recovered relative to the resources required to prosecute such an action. *See Chavez v. Blue Sky*

*Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (evaluating superiority under Rule 23(b)(3) and noting that "the class action is superior to maintaining individual claims for a small amount of damages"). A class action is superior to other forms of litigation in this action.

Accordingly, the Court finds that conditional class certification for settlement purposes is proper.

### B.     Class Counsel

"[A] court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In considering this appointment, a court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A). Plaintiff's counsel has litigated numerous wage-and-hour class action cases, and is thus experienced in the field. (*See* Dkt. Nos. 5-2 at ¶ 6; 75-3 at ¶ 4; 86 at ¶ 8.) In this action, Plaintiff's counsel has engaged in considerable motion practice, including multiple motions to remand, dismiss, and for change of venue, as well as a Ninth Circuit appeal. Counsel also participated in an ultimately fruitful mediation. The Court accordingly concludes that counsel has the requisite experience, knowledge, qualifications, and resources to represent the class members in this action and that the reasons for pursuing settlement at this stage in the litigation do not call into question their representation of absent class members.

### C.     Preliminary Approval of the Settlement

In determining whether a settlement agreement is fair, adequate, and reasonable to all concerned, a court typically considers the following factors: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members

United States District Court
Northern District of California

10

United States District Court
Northern District of California

1  of the proposed settlement." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th

2  Cir. 2011) (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

3          However, when "a settlement agreement is negotiated *prior* to formal class certification,

4  consideration of these eight . . . factors alone is" insufficient.  *Id.*  In these cases, courts must

5  show not only a comprehensive analysis of the above factors, but also that the settlement did not

6  result from collusion among the parties.  *Id.* at 947.  Because collusion "may not always be

7  evident on the face of a settlement, . . . [courts] must be particularly vigilant not only for explicit

8  collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-

9  interests and that of certain class members to infect the negotiations."  *Id.*  In *Bluetooth*, the court

10 identified three such signs:

11             (1) when class counsel receives a disproportionate distribution of the
              settlement, or when the class receives no monetary distribution but
12            counsel is amply rewarded;

13             (2) when the parties negotiate a "clear sailing" arrangement
              providing for the payment of attorney's fees separate and apart from
14            class funds without objection by the defendant (which carries the
              potential of enabling a defendant to pay class counsel excessive fees
15            and costs in exchange for counsel accepting an unfair settlement);
              and
16

17             (3) when the parties arrange for fees not awarded to revert to
              defendants rather than be added to the class fund.
18
   *Id.*
19
           The Court cannot fully assess all of these fairness factors until after the final approval
20
   hearing; thus, "a full fairness analysis is unnecessary at this stage."  *Alberto v. GMRI, Inc.,* 252
21
   F.R.D. 652, 665 (E.D. Cal. 2008) (internal quotation marks and citation omitted).  Instead, "the
22
   settlement need only be *potentially* fair, as the Court will make a final determination of its
23
   adequacy at the hearing on Final Approval, after such time as any party has had a chance to
24
   object and/or opt out."  *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386 (C.D. Cal. 2007).  At
25
   this juncture, "[p]reliminary approval of a settlement and notice to the class is appropriate if [1]
26
   the proposed settlement appears to be the product of serious, informed, noncollusive
27
   negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment
28
   to class representatives or segments of the class, [4] and falls within the range of possible

11

approval." *Cruz v. Sky Chefs, Inc.*, No. 12-02705, 2014 WL 2089938, at *7 (N.D. Cal. May 19, 2014) (quoting *In re Tableware Antitrust Litig.,* 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)).

### 1. The Fairness Factors

#### 1. The Proposed Settlement

This first factor concerns "the means by which the parties arrived at settlement." *Harris v. Vector Mktg. Corp.*, No. 08–5198, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011). For the parties "to have brokered a fair settlement, they must have been armed with sufficient information about the case to have been able to reasonably assess its strengths and value." *Acosta*, 243 F.R.D. at 396. Particularly with pre-certification settlements, enough information must exist for the court to assess "the strengths and weaknesses of the parties' claims and defenses, determine the appropriate membership of the class, and consider how class members will benefit from settlement" in order to determine if it is fair and adequate. *Id.* at 397 (internal quotation marks omitted).

The use of a mediator and the presence of discovery "support the conclusion that the Plaintiff was appropriately informed in negotiating a settlement." *Villegas*, 2012 WL 5878390, at *6; *Harris*, 2011 WL 1627973, at *8 (noting that the parties' use of a mediator "further suggests that the parties reached the settlement in a procedurally sound manner and that it was not the result of collusion or bad faith by the parties or counsel"). However, the use of a neutral mediator "is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement." *Bluetooth*, 654 F.3d at 948.

Here, in preparation for the mediation, Defendants provided Plaintiff with "over 426,000 lines of time entries (punch data) for the class, over 42,000 lines of wage data for the class, over 7,400 lines of meal period premium data for the class, job descriptions for the various positions in the class, handbooks/manuals containing the relevant policies and procedures, and hundreds of pages of documents that describe the policies and procedures at issue in the litigation (scheduling templates, checklists, reference guides, etc.)." (Dkt. No. 75-1 at ¶ 13.) The parties thereafter participated in an all-day mediation with a mediator experienced in wage and hour class actions, and continued to work together after the mediation to formulate the settlement. On balance, the

12

1    settlement appears to be the produce of serious, informed, non-collusive negotiations, and this

2    factor weighs in favor of preliminary approval of the settlement.

3            **2.   Obvious Deficiencies**

4            The Court next considers "whether there are obvious deficiencies in the Settlement

5    Agreement." *Harris*, 2011 WL 1627973, at *8. The Court initially identified the following three

6    deficiencies—or potential deficiencies—in the settlement agreement: 1) the 30 percent of the fund

7    requested for attorney's fees, (2) the scope of the release, and (3) the timeframe for notice.  At the

8    preliminary approval hearing, the Court discussed these issues with the parties, and in response,

9    the parties have amended the settlement to address the Court's concerns with the second and third

10   issues.  The release has been re-written to only cover the legal claims raised in this action and the

11   notice process now allows 75 days for submission of the claim form, rather than the prior 60

12   days.[6]

13           The matter of the attorney's fees, however, remains.  "While attorneys' fees and costs may

14   be awarded in a certified class action where so authorized by law or the parties' agreement,

15   Fed.R.Civ.P. 23(h), courts have an independent obligation to ensure that the award, like the

16   settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*,

17   654 F.3d at 941. Where a settlement produces a common fund for the benefit of the entire class,

18   courts have discretion to employ either the lodestar method or the percentage-of-recovery method.

19   *See In re Mercury Interactive Corp.*, 618 F.3d 988, 992 (9th Cir. 2010). "Because the benefit to

20   the class is easily quantified in common-fund settlements, we have allowed courts to award

21   attorneys a percentage of the common fund in lieu of the often more time-consuming task of

22   calculating the lodestar." *Bluetooth*, 654 F.3d at 942 (noting that 25% of the fund is considered the

23   "benchmark" for a reasonable fee). "Though courts have discretion to choose which calculation

24

25   _____

     [6] The Court thereafter requested briefing about two additional issues: (1) although the settlement
26   releases all PAGA claims, it did not call for payment of any PAGA penalties, and (2) the
     settlement did not provide any opportunity for class members to object to the fee motion pursuant
27   to Federal Rule of Civil Procedure 23(h).  (Dkt. No. 88.)  The parties subsequently filed a Second
     Amended Joint Stipulation re: Class Action Settlement which addressed the Court's concerns by
28   providing for payment of a PAGA penalty, and notifying class members of their right to object to
     the settlement and/or the motion for attorney's fees and costs.  (Dkt. No. 89.)

United States District Court
Northern District of California

13

method they use, their discretion must be exercised so as to achieve a reasonable result. Thus, for example, where awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead." *Id*. (citations omitted).

"The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *Id*. at 941. The resulting figure may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment. *Hanlon*, 150 F.3d at 1029.

The Ninth Circuit recommends that whatever method is used, the district court perform a cross-check using the second method to confirm the reasonableness of the fee, e.g., if the lodestar method is applied, a cross-check with the percentage-of-recovery method will reveal if the lodestar amount surpasses the 25% benchmark. *See Bluetooth*, 654 F.3d at 944–45.

Plaintiff seeks an award of attorneys' fees in the amount of 33.3 percent of the settlement fund; that is, $166,665.00. Plaintiff argues that this fee award is proper based on the work performed in this action and the results achieve for the class. (Dkt. No. 75 at 13.) However, Plaintiff fails to show that "the risks associated with this case are [ ] greater than that associated with any other wage and hour action." *Clayton v. Knight Transp*., No. 11–00735, 2013 WL 5877213, at *8 (E.D. Cal. Oct. 30, 2013) (rejecting plaintiff's contention that contingent nature of the case warranted an increase above the 25 percent benchmark). And while many class members in this case will likely recover a monetary award in the range of a few hundred dollars, Plaintiff has failed to show that this benefit is exceptional relative to Defendant's potential liability.

At this stage, Plaintiff has failed to persuade the Court that attorneys' fees of 33.3 percent of the fund are appropriate; however, the Court will wait until final approval to make a determination as to fees. Along with the parties' final approval filings with the Court, Plaintiff shall submit detailed billing records and an explanation of her counsels' hourly rate so that the Court may determine an appropriate lodestar figure. *See Bluetooth*, 654 F.3d at 944–45.

1    Thus, while the Court has concerns about the amount of fees sought, given that the amount

2    of fees is ultimately in the Court's discretion, the settlement lacks obvious deficiencies which

3    would preclude preliminary approval.

4          **3. Lack of Preferential Treatment**

5          Under this factor, "the Court examines whether the Settlement provides preferential

6    treatment to any class member." *Villegas*, 2012 WL 5878390, at *7. Each proposed class

7    member in this case may claim their pro rata share of the fund based on the number of workweeks

8    worked during the class period, less the employee's share of statutorily required tax withholdings.[7]

9    The settlement further provides that Plaintiff will receive a $7,500 enhancement award.

10   "Incentive awards [as opposed to agreements] are fairly typical in class action cases." *Rodriguez v.*

11   *W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir.2009). There is no evidence that named Plaintiff and

12   counsel agreed prior to the suit to a particular incentive agreement. Though viewed more

13   favorably than incentive agreements, "excess incentive awards may put the class representative in

14   a conflict with the class and present a considerable danger of individuals bringing cases as class

15   actions principally to increase their own leverage to attain a remunerative settlement for

16   themselves and then trading on that leverage in the course of negotiations." *Id.* at 960 (internal

17   quotation marks and citation omitted). Incentive awards "compensate class representatives for

18   work done on behalf of the class, to make up for financial or reputational risk undertaken in

19   bringing the action, and, sometimes, to recognize their willingness to act as a private attorney

20   general." *Id.* at 958–59.

21         Plaintiff's request for a $7,500 incentive award is fifty-percent more than the amount

22   generally awarded by courts in this district. *See, e.g.*, *Wren v. RGIS Inventory Specialists*, No. 06–

23   05778, 2011 WL 1230826, at *37 (N.D. Cal. Apr. 1, 2011) (approving $5,000 incentive awards to

24   

---

25   [7] At the preliminary approval hearing, the Court inquired as to how this calculation would
     differentiate between full and part-time employees given counsel estimate that 70 percent of the

26   class was full-time employees, and 30 percent part-time. Defense counsel has since confirmed
     that their historical data does not contain this information, and current employee schedules may

27   fluctuate sufficiently such that it is impracticable to distinguish between the two. (Dkt. No. 87-2 ¶
     3.) The settlement has also been revised to clarify that it is only the employee's share of the taxes

28   which will be taken out of the settlement amount—Defendant is responsible for separately
     contributing its share of the taxes. (Dkt. No. 87 at ¶ 17(a).)

United States District Court
Northern District of California

24 named plaintiffs in $27,000,000 settlement) supplemented, No. 06–05778, 2011 WL 1838562 (N.D. Cal. May 13, 2011); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (approving $5,000 to two plaintiff representatives of 5,400 potential class members in $1.75 million settlement); *Hopson v. Hanesbrands, Inc.*, No. CV–08–0844, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009) (approving $5,000 award to one member of 217 member class from $408,420 settlement amount).  At the same time, the Court is aware from having presided over the action that this case has engendered significant motion practice and litigation given the multiple remand motions and appeal thereof.  Ultimately, the Court need not resolve the matter at this preliminary approval stage, and thus, defers the issue to final approval.

### 4. Range of Possible Approval

Finally, the Court must determine whether the proposed settlement falls within the range of possible approval. "To evaluate the range of possible approval criterion, which focuses on substantive fairness and adequacy, courts primarily consider plaintiff's expected recovery balanced against the value of the settlement offer." *Harris*, 2011 WL 1627973, at *9 (internal citation and quotation marks omitted).

Plaintiff estimates Defendants' potential liability to be $3,512,000 for all the claims.  The settlement fund of $500,000 thus equals 10.7 percent of the total potential liability exposure, before any deductions for fees, costs, or incentive awards.  Because this represents a significant departure from the parties' prior estimates as to the amount in controversy—which was the subject of extensive briefing and two Orders valuing the claims between $4.7 million and $5.4 million— the Court questioned Plaintiff regarding the valuation of the claims at the hearing and Plaintiff submitted a supplemental declaration.[8]  (Dkt. No. 86.)  According to counsel, documents produced

---

[8] The Court's initial remand Order valued Plaintiff's claims at $4,712,595.  Following the Ninth Circuit's reversal and remand, the Court revisited the calculations under the new preponderance of the evidence standard and concluded that Defendants had established by a preponderance of the evidence that the amount in controversy was $5,433,414.35.  The Court's calculations were based information supporting Defendants' notice of removal and Defendants' opposition to Plaintiff's Motion to remand.  (Dkt. Nos. 3-4 & 22-2.)  In particular, Defendants' counsel, Beth Gunn, submitted a declaration indicating that the breakdown among Class Members was 70 percent full-time and 30 percent part-time, and the average hourly rate of pay among class members was $14.87.  (Dkt. No. 22-2 at ¶ 8; Ex. B (p. 13).)  Based on this information, the Court performed detailed calculations and valued each of Plaintiff's claims as follows:
Claim 1: Off-the-clock Claim – $1,394,206.28

16

*United States District Court*
*Northern District of California*

1    for purposes of mediation caused them to reevaluate their claims as follows.

2        For the meal period claim, the employee time records reflected a meal period violation rate

3    of less than five percent.  (Dkt. No. 86 at ¶ 12.)  Based on this data, Plaintiff's expert estimated

4    that there were 21,000 violations, which equaled approximately $312,000 in potential meal period

5    penalties at the average hourly rate.  However, Defendant produced evidence showing that it had

6    paid over 8,000 meal period premiums though April 2012.  (*Id*.)  Counsel estimated that this left

7    just 800 unpaid violations for a total of $12,000 in damages.  (*Id*.)  The valuation in the remand

8    motion assumed a much higher violation rate and failed to account for the meal period premiums

9    Defendant paid through April 2012.  (*Id*. at ¶ 13.)

10       For the off-the-clock claim, counsel attests that the prior valuation over-estimated the

11   amount of the off-the-clock time because Plaintiff was unaware of two things.  First, Plaintiff was

12   unaware of Defendant's practice of rounding up time entries for pay periods to the nearest 15-

13   minute increment effectively "mut[ing] much of the effect of any preliminary and postlimary work

14   performed by the class members."  (*Id*. at ¶ 15.)  Second, Plaintiff was unaware that many of the

15   class members were salaried non-exempt employees who were paid the same amount for all hours

16   worked up to 40 within a week, so to the extent the pre and post shift work did not push them over

17   40-hours a week, it was accounted for in their salary.  Given these two factors, counsel suggests

18   that the potential damages should be cut in half to approximately $1 million.  (*Id*.)

19       The derivative penalties for the waiting time and wage statement are estimated to be worth

20   $900,000 to $1,600,000, respectively, which is within the range of the prior estimates.  (*Id*. at ¶

21   17.)

22       As noted, the $500,000 settlement represents only 10.7 percent of the potential recovery

23   based on Plaintiff's liability estimates.  This amount, while low, is not "per se inadequate or

24   unfair" given the limitations on Plaintiff's claims outlined above.  *Officers for Justice v. Civil*

25   *Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982) ("It is well-settled law that a cash settlement

26

27   Claim 2: Missed Meal Break – $ 1,144,511.20
     Claim 3: Waiting Time Penalties – $1,025,492

28   Claim 4: Inaccurate Wage Statements – $1,009,600
     (Dkt. No. 58 at 9-14.)

United States District Court
Northern District of California

amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair."); *see also In re Mego*, 213 F.3d at 459 (noting that whether the settlement is fair and adequate depends on the "the difficulties in proving the case").  Further, any concerns that the Court might have are best addressed at final approval following the claims administration process.  *Harris v. Vector Mktg. Corp.*, No. 08-5198, 2011 WL 1627973, at *14 (N.D. Cal. Apr. 29, 2011) ("the actual value of the settlement cannot be accurately assessed until the claims process is completed. At the time of the final fairness hearing, the parties and the Court will be in a position to accurately calculate the value of the settlement and compare it to the maximum damages recoverable were the Plaintiff class to succeed at trial.").

In consideration of all the foregoing factors, the Court makes a preliminary finding that the proposed settlement is fair, adequate and reasonable and in the best interests of the class members given the uncertainty of continued litigation.

**D.**      **Class Notice Plan**

For any class certified under Rule 23(b)(3), class members must be afforded the best notice practicable under the circumstances, which includes individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:

> (i) the nature of the action;
>
> (ii) the definition of the class certified;
>
> (iii) the class claims, issues, or defenses;
>
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
>
> (v) that the court will exclude from the class any member who requests exclusion;
>
> (vi) the time and manner for requesting exclusion; and
>
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).  "Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill*, 361 F.3d at 575 (internal quotation marks omitted).

The Court notes one minor issue with respect to the notice.  In Section V. two different

United States District Court
Northern District of California

1    claims administrators are referenced in subsection A and C.  Subsection C shall be amended to

2    indicate that Rust Consulting, Inc. is the Claims Administrator.  The information described in the

3    notice otherwise meets the requirements of Rule 23(c)(2)(B).

4         The notice plan itself is likewise adequate.  Within 15 days of preliminary approval

5    Defendant will provide the Claims Administrator with the class members' last known addresses

6    and within 10 days of receipt of that information the Claims Administrator will mail and email (to

7    current employees) the notice packet to the class members.   The Claims Administrator will

8    engage in skip tracing to locate the addresses for class members whose notices are returned.

9    Further, a reminder postcard will be mailed 30 days before the Claims Receipt Deadline.

10        At the hearing, counsel also agreed to create a website for the class members.  Although

11   this is not referenced in the parties' joint stipulation, the Notice states that the Claims

12   Administrator will also establish a website which will have "a complete copy of the settlement

13   agreement, the motion for attorney's fees and costs, and any papers filed in this action."  (Dkt. No.

14   89 at 47.)  Class Counsel shall ensure that the website has a complete copy of the settlement

15   agreement, the Notice and Claim Form, the Motion for Preliminary Approval and the Second

16   Amended Joint Stipulation re: Class Action Settlement, the Motion for Attorney's Fees and Costs,

17   and the Motion for the Class Enhancement Award, as well as the Motion for Final Approval of the

18   Class Action Settlement.

19                                   **CONCLUSION**

20        The Court preliminarily finds that the proposed class meets the requisite certification

21   standards and GRANTS conditional certification of the class for settlement purposes.  The

22   proffered settlement agreement, as amended by the parties' stipulations filed July 13 and August

23   17, 2015 (Dkt. Nos. 87 & 89), meets the requisite requirements for fair, adequate, and reasonable

24   settlement at this juncture of the settlement process.  For the reasons stated above, the Court

25   therefore GRANTS the motion for preliminary approval of the class action settlement as follows:

26        1.  Roger Carter and Scott Cooper of the Carter Law Firm, and Marc H. Phelps of the

27             Phelps Law Group are appointed as Class Counsel, and Plaintiff Cheryl Deaver is

28             appointed as the Class Representative for settlement purposes

United States District Court
Northern District of California

19

1    2.   Notice shall be provided in accordance with the notice plan and this Order.

2    3.   Within 25 days, Class Counsel shall file a motion seeking approval of attorneys'

3         fees and costs and the proposed incentive awards.

4    4.   Counsel shall return before this Court for a final approval hearing, at which the

5         Court shall finally determine whether the settlement is far, reasonable, and

6         adequate, on December 10, 2015 at 9:00 a.m. in Courtroom F, 450 Golden Gate

7         Ave., San Francisco, California.

8    5.   Class Counsel shall file a noticed motion for final approval of the settlement no

9         later than 35 days before the final approval hearing.

10

11   **IT IS SO ORDERED.**

12   Dated:  August 21, 2015

13

14

15   JACQUELINE SCOTT CORLEY
     United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28