UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHERYL DEAVER,<br><br>        Plaintiff,<br><br>    v.<br><br>COMPASS BANK, et al.,<br><br>        Defendants. | Case No.  13-cv-00222-JSC<br><br>**ORDER RE: FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AND PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, COSTS, AND AN INCENTIVE AWARD**<br><br>Re: Dkt. Nos. 92 & 93 |

In this pre-certification class action dispute, Plaintiff Cheryl Deaver alleges that, among other things, Defendants Compass Bank, Inc. ("Compass") and BBVA Compass Insurance Agency, Inc. ("BBVA") maintained and enforced unlawful practices and policies in violation of California wage and hour laws.  On August 21, 2015, the Court issued an Order granting the parties' joint Motion for Preliminary Approval of Class Action Settlement. (Dkt. No. 91.)  Now pending before the Court are Plaintiff's motion for final approval of a class action settlement (Dkt. No. 93), and Plaintiff's motion for attorneys' fees, costs, and an incentive award for the named Plaintiff (Dkt. No. 92).  Defendants do not oppose the motions.  The Court held a fairness hearing regarding final approval and fees on December 10, 2015 and no one appeared to object to either motion.  Having considered the arguments of counsel and the papers submitted, the Court GRANTS final approval of the settlement agreement; GRANTS IN PART the requested attorneys' fees and costs; and GRANTS the requested incentive award for the class representative as set forth below.

## BACKGROUND

Defendants, Texas and Alabama corporations, collectively doing business as "BBVA

Compass" operate a chain of retail banking centers throughout California.  Plaintiff, a California citizen, worked for BBVA Compass as a non-exempt financial sales advisor.  Plaintiff's Revised Second Amended Complaint ("SAC2")  includes five causes of action under California law:  (1) failure to pay wages for hours worked in violation of California Labor Code Section 1194; (2) failure to provide meal periods or compensation in lieu thereof in violation of California Labor Code Sections 226, 226.7, 1174(d), and Section 11 of the IWC Wage Orders, and Cal. Code Regs., Title 8, section 11000 et seq.; (3) failure to timely pay wages due at termination in violation of California Labor Code Sections 21, 202, 203; (4) failure to provide accurate wage statements in violation of California Labor Code Section 226(a); and (5) violation of Unfair Competition Law, California Business and Professions Code Section 17200 et seq.  (Dkt. No. 66 ¶¶ 35-65.)

The case has a complicated and protracted procedural history, which is briefly summarized below.

Plaintiff initially filed suit in Riverside County Superior Court (the "Prior Action"). Pursuant to the Class Action Fairness Act ("CAFA") of 2005, *see* 28 U.S.C. §§ 1332(d), 1441, 1453, Defendants removed the Prior Action to the Central District.  (Case No. EDCV11-1489 PSG).  Plaintiff did not move to remand, and the case remained in federal court.  The parties thereafter stipulated to dismissal of the Prior Action without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), with each party to bear her or its own attorneys' fees and costs, and the court so ordered.  (*Id*. at 10-12.)  The stipulation did not contain any conditions or limitations on Plaintiff's ability to file the same, or a similar action, in the future.

Approximately four months after the stipulated dismissal of the Prior Action, Plaintiff filed the present putative class action complaint ("the Complaint") in Alameda County Superior Court. Defendants timely removed the Complaint on the ground that this Court has original jurisdiction under CAFA.  In their removal papers, Defendants performed calculations for each of Plaintiff's causes of action on a class-wide basis and determined that the total amount in controversy was $5,772,662.  However, as Plaintiff demonstrated in her motion to remand and as Defendants conceded, Defendants' original calculations contained errors that inflated the final amount above the $5,000,000 threshold.  Defendants corrected those errors in their subsequent calculations in their opposition to the motion to remand ("Opposition"), but in so doing, they also changed their

approach to those calculationsApplying the legal certainty test to the allegations of the Complaint together with Defendants' evidence, the Court concluded that the amount in controversy was not satisfied and remanded the case to Alameda County Superior Court.[1]

Pursuant to CAFA, Defendants timely filed a petition with the Ninth Circuit for permission to appeal the remand order.  *See* 28 U.S.C. § 1453(c)(1).  While the petition was pending, the Ninth Circuit overruled the legal certainty test of *Lowdermilk v. United States Bank National Association*, 479 F.3d 994 (9th Cir. 2007), as a result of the United States Supreme Court's decision in *Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345 (2013), and held that under CAFA a removing defendant must satisfy the amount in controversy by a preponderance of the evidence. *Rodriguez v. AT&T Mobility Servs. LLC,* 728 F.3d 975, 981-82 (2013).  *Rodriguez* also held that in determining the amount in controversy courts "must necessarily 'look beyond the four corners of the complaint' when the complaint alleges damages below the jurisdictional minimum." *Id*. at 981.  In light of *Rodriguez*, Defendants again removed the action from the Alameda Superior Court and the action was ultimately assigned to the undersigned judge.   N.D. Cal. Case No. 13-cv-4598 (JSC).  Plaintiff then moved, again, to remand.  In the meantime, the Ninth Circuit vacated the remand order and sent the case back to this Court for reconsideration in light of *Rodriguez*.  The Court ultimately denied Plaintiff's first motion to remand concluding that Defendants had established by a preponderance of the evidence that the amount in controversy was $5,433,414.35, thus satisfying the CAFA jurisdictional requirements.[2]  (Dkt. No. 58 at 14. [3]).  The Court also denied Defendants' motion to transfer venue to the Central District—the venue of the Prior Action.  (*Id*. at 18.)  The Court, however, granted Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  (*Id*. at 19.)

Plaintiff thereafter filed her Second Amended Complaint and then the operative Revised

---

[1]  In support of their claims of CAFA jurisdiction, Defendants provided extensive data regarding the size of the class, number of workweeks worked, average hourly rates for class members, percentage of full-time and part-time workers in the class; this evidence formed the basis for these calculations.  (Dkt. Nos. 4; 22-2; 22-3.)

[2]  Given the Court's conclusion that jurisdiction lay in federal court, the second removal action was dismissed as moot.  (Dkt. No. 58.)

[3]  Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

1   Second Amended Complaint.[4]  (Dkt. Nos. 59 and 66.)

2       On April 30, 2015, Plaintiff filed a motion for preliminary approval of a class action

3   settlement. (Dkt. No. 75.)   Following a hearing on June 4, 2015, the parties filed an Amended

4   Joint Stipulation Re: Class Action Settlement and supplemental declaration to address certain

5   concerns raised by the Court.  (Dkt. Nos. 86 & 87.)  The Court thereafter requested additional

6   briefing (Dkt. No. 88) and the parties submitted a Second Amended Joint Stipulation Re: Class

7   Action Settlement (Dkt. No. 89) which modified the settlement and proposed notice to address the

8   two concerns raised by the Court.  The Court then granted the parties' motion for preliminary

9   approval of the settlement on August 21, 2015.  (Dkt. No. 91.)  In accordance with the order

10  granting preliminary approval, Plaintiff filed her motion for attorneys' fees, costs, and a

11  representative incentive award on September 15, 2015.  (Dkt. No. 92.)  Plaintiff filed a motion for

12  final approval on November 5, 2015 and a supplemental declaration from the settlement

13  administrator following the close of the claims period.  (Dkt. Nos. 93 & 97.)  The Court held a

14  hearing on the motions on December 10, 2015.

### SETTLEMENT PROPOSAL

15      On December 10, 2014, the parties participated in a full-day mediation session with

16  Mariam Zadech, Esq., an independent mediator with extensive experience in wage and hour class

17  actions.  (Dkt. No. 89 at ¶ 4.)  In preparation for the mediation, Defendants provided Plaintiff with

18  "over 426,000 lines of time entries (punch data) for the class, over 42,000 lines of wage data for

19  the class, over 7,400 lines of meal period premium data for the class, job descriptions for the

20  various positions in the class, handbooks/manuals containing the relevant policies and procedures,

21  and hundreds of pages of documents that describe the policies and procedures at issue in the

22  litigation (scheduling templates, checklists, reference guides, etc.)."  (Dkt. No. 75-1 at ¶ 13.)

23  Although the parties did not reach an agreement at the mediation, their negotiations continued and

24  on January 16, 2015, the parties reached an agreement on the basic terms of the settlement.  (*Id*. at

25  ¶¶ 15-16.)

26      The parties' settlement agreement provides a settlement fund of $500,000.  Reduced from

27  ───────────────

28  [4] Based on the parties' stipulation, the Revised Second Amended Complaint omitted the Private
    Attorneys General Act of 2004 claim which had been added to the Second Amended Complaint.
    (Dkt. No. 62.)

United States District Court
Northern District of California

that fund are (1) attorney's fees up to one-third of the fund ($166,665), (2) actual litigation costs of up to $20,000[5], (3) an enhancement award for the named Plaintiff of $7,500, (4) claims administration expenses up to $20,000[6], and (5) a $5,000 PAGA penalty, 75 percent of which shall be paid to the California Labor & Workforce Development Agency, and 25 percent shall be included in the net distribution to the class.  (Dkt. No. 89 at ¶ 18.)  The remaining funds are then distributed to the class members who do not opt out of the class.  Class members will receive a pro rata share of the fund based on the number of workweeks worked.[7]  (*Id.* at ¶ 18(g).)  All checks to non-objecting class members not cashed within 90 days of mailing will escheat to the California Industrial Unclaimed Wages Fund.  No settlement funds will revert to Defendants.

## DISCUSSION

Judicial policy strongly favors settlement of class actions.  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  "To vindicate the settlement of such serious claims, however, judges have the responsibility of ensuring fairness to all members of the class presented for certification."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Where the "parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement."  *Id.*  In the first stage of the process, as here, the court preliminarily approves the settlement pending a final fairness hearing, temporarily certifies a settlement class, and authorizes notice to the class.

---

[5] In the motion for attorneys' fees, class counsel indicates that the actual costs are $19,701.27, but estimates that this amount will increase based on travel for the final approval hearing.  (Dkt. No. 92 at 22 n.5.)

[6] The Claims Administrator submitted a declaration indicating that the cost of claims administration was estimated to be $20,000.  (Dkt. No. 93-1 ¶ 20.)

[7] The precise calculation is as follows:

> The Net Settlement Amount shall be divided by the number of aggregate Qualified Workweeks worked by all Class Members during the Class Period to produce a "Weekly Settlement Value." The number of "Qualified Workweeks" worked by each class member shall be determined by the length of each Class Member's employment with Defendant[s] during the Class Period, as a non-exempt branch employee in California. Each Class Member shall be eligible to receive a settlement payment in the amount of the total number of Qualified Workweeks worked by the Class Member multiplied by the Weekly Settlement Value, less applicable withholdings provided that the Class Member has signed and submitted a timely and valid Claim Form.

(Dkt. No. 89 at ¶ 18(g).)

United States District Court
Northern District of California

*See Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at

*5 (N.D. Cal. Nov. 21, 2012). "At the [final] fairness hearing, presently before the Court, after

notice is given to putative class members, the Court entertains any of their objections to (1) the

treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v.

Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014) (citing *Diaz v. Trust Territory of Pac. Islands*, 876

F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must reach a

final determination as to whether the parties should be allowed to settle the class action pursuant

to their agreed upon terms. *See id.*; *Telecommc'ns Coop. v. DIRECTV, Inc.*, 221 F.R.D. 525, 535

(C.D. Cal. 2004).

## I.      Final Approval of Class Action Settlement

### A.      <u>Final Class Certification of the Settlement Class</u>

#### 1.      *Rule 23(a) Requirements*

Class actions must meet the following requirements prior to certification:

> 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties will fairly and adequacy protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are known as numerosity, commonality, typicality, and

adequacy of representation, respectively. *Leyva*, 716 F.3d at 512. The Court must determine that

Plaintiffs have satisfied their burden to demonstrate that the proposed class satisfies each element

of Rule 23. These requirements "demand undiluted, even heightened attention in the settlement

context . . . for a court asked to certify a settlement class will lack the opportunity, present when a

case is litigated, to adjust the class, informed by the proceedings as they unfold." *Amchem Prods.

Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

In the Court's Order granting preliminary approval of the settlement, the Court found that

the putative class satisfied the numerosity, commonality, typicality, and adequacy of

representation requirements of Rule 23(a). (Dkt. No. 91 at 8.) The Court is unaware of any

changes that would alter its analysis, and the parties did not indicate either in their papers or at the

United States District Court
Northern District of California

United States District Court
Northern District of California

1  fairness hearing that any such developments had occurred.  Thus, the Court concludes that all four

2  of Rule 23(a)'s requirements have been met.

3          **2.**      ***Rule 23(b) Requirements***

4        In addition to meeting the requirements of Rule 23(a), a potential class must also meet one

5  of the conditions outlined in Rule 23(b)—of relevance here, the condition that "the court finds that

6  the questions of law or fact common to class members predominate over any questions affecting

7  only individual members, and that a class action is superior to other available methods for fairly

8  and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In evaluating the proposed

9  class, "pertinent" matters include:

10         (A) the class members' interests in individually controlling the
11         prosecution or defense of separate actions;

12         (B) the extent and nature of any litigation concerning the
        controversy already begun by or against class members;

13         (C) the desirability or undesirability of concentrating the litigation of
14         the claims in the particular forum; and

15         (D) the likely difficulties in managing a class action.

16 Fed. R. Civ. P. 23(b)(3).  In its Order granting preliminary approval of the settlement, the Court

17 found that both prerequisites of Rule 23(b)(3) were satisfied.  (Dkt. No. 91 at 9-10.)  The Court is

18 unaware of any changes that would alter its analysis, and that parties did not indicate either in their

19 papers or at the fairness hearing that any such developments had occurred.  There were no

20 objections by individual class members who claim to have an interest in controlling the

21 prosecution of this action or related actions.[8]

22         **3.**      ***Rule 23(c)(2) Notice Requirements***

23       Finally, if the Court certifies a class under Rule 23(b)(3), it "must direct to class members

24 the best notice that is practicable under the circumstances, including individual notice to all

25 members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Rule

26 

---

27 [8] The Notice of Settlement directed class members who wished to object to file their objection
with the Court and serve a copy of their objection on the parties' attorneys.  The claims

28 administrator indicated that as of the November 29, 2015 deadline, it had not received any
objections.  (Dkt. No. 97 at ¶ 10.)  There were no objections voiced at the hearing.

23(c)(2) governs both the form and content of a proposed notice. *Se Ravens v. Iftikar*, 174 F.R.D. 651, 658 (N.D. Cal. 1997) (citation omitted). The notice must be "reasonably certain to inform the absent members of the plaintiff class," but Rule 23 does not require actual notice. *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994).

As the settlement agreement provides, the settlement administrator, Rust Consulting, mailed notice of the settlement to the last known address of all 931 identified class members on September 15, 2015. (Dkt. No. 93-1 at ¶ 12.) Notice for 65 class members was returned as undeliverable and the settlement administrator performed "skip traces" to locate more current addresses for 56 class members. (Dkt. No. 97 ¶ 4.) The settlement administrator promptly re-mailed notice to these 56 class members, and 8 were returned as undeliverable a second time, leaving 17 class members to whom notice was undeliverable due to lack of a current address. (*Id.*) The Court is satisfied that this system of providing notice was reasonably calculated to provide notice to class members and was the best form of notice available under the circumstances.

Likewise, the notice itself clearly identifies the options available to putative class members—do nothing; object to the terms of the settlement, the scope of attorneys' fees, and/or the amount of the enhancement incentive award for the named Plaintiff; or opt out—and also thoroughly explained the nature and mechanics of settlement. (*See* Dkt. No. 93-1 at 8-11.) The content of the notice is therefore sufficient to satisfy Rule 23(c)(2)(B). *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" (citation omitted)).

* * *

Because the settlement class satisfies Rules 23(a) and 23(b)(3), and notice was sufficient in accordance with Rule 23(c), the Court will grant final class certification.

### B.     Approval of the Settlement

Having determined that class treatment is warranted, the Court now addresses whether the terms of the parties' settlement appears fair, adequate, and reasonable under Rule 23(e). In making this determination, a court typically considers the following factors initially set forth in

United States District Court
Northern District of California

*Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566 (9th Cir. 2004): "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *Id.* at 575.  The court need not consider all of these factors, or may consider others.  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("The factors in a court's fairness assessment will naturally vary from case to case.").

But in *Bluetooth*, the Ninth Circuit explained that when "a settlement agreement is negotiated *prior* to formal class certification, consideration of these eight . . . factors alone is" insufficient.  *Id.*  In these cases, courts must show not only a comprehensive analysis of the above factors, but also that the settlement did not result from collusion among the parties.  *Id.* at 947.  Because collusion "may not always be evident on the face of settlement, . . . [courts] must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations."  *Id.*   The court identified three such signs:

> (1) when class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply awarded[;]
>
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds without objection by the defendant (which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class[;] and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than to be added to the class fund.

*Id.* (internal quotation marks and citations omitted).  For the reasons stated below, a review of these factors indicates that on balance this Settlement is fair, adequate, and reasonable.

**1.   Strength of Plaintiff's Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation**

One important consideration is the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement. *DIRECTV*, 221 F.R.D. at 526. Although this action reached settlement before the Court had occasion to consider the claims' merits, the Court need not reach an ultimate conclusion about the merits of the dispute now, "for it is the very uncertainty of outcome in litigation and avoidance of wastefulness and expensive litigation that induce consensual settlements." *Officers for Justice v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Rodriguez*, 563 F.3d at 965 (internal quotation marks omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id.*

Here, Plaintiff alleges on behalf of herself and all current and former non-exempt branch employees that Defendants failed to pay wages, failed to provide meal periods, failed to timely pay wages at termination, failed to provide itemized employee wage statements in violation of various California Labor Law provisions, and California's Unfair Competition Law. (Dkt. No. 66.) Although Plaintiff contends that her claims are meritorious, she acknowledges that there are significant legal uncertainties associated with the meal period and off-the-clock claim. As the Court noted in its preliminary approval order, Defendants have produced documents indicating that Plaintiff significantly over-valued these claims. (Dkt. No. 91 at 17.) In particular, for the meal period claim, the documents show that the violation rate is less than five percent and that Defendants previously paid a large number of meal period premiums leaving only an estimated $12,000 recoverable in damages. (Dkt. No. 86 at ¶ 12.) Similarly, based on information subsequently disclosed by Defendants regarding their practice of rounding up time entries and classifying class members as salaried non-exempt employees, Plaintiff estimates that the off-the-

clock claim was worth half of the previously estimated $2 million.  (*Id*. at ¶¶ 14-15.)  Plaintiff also notes that several courts have declined to certify off-the-clock and meal/rest period claims such as those raised herein.  Finally, Plaintiff cites to the risks of continuing to litigate this action including the risk of changes in the law, increased costs, and the passage of time.  The Court separately notes Defendants' vigorous defense of this action, which has already resulted in successful motions to remand and dismiss, and an appeal to the Ninth Circuit Court of Appeals.  In light of all this, the Court concludes that there is a significant risk that litigation might result in a smaller or non-existent recovery for the class members.

Given the risks and costs of continued litigation, the immediate rewards to class members are preferable.  Specifically, each class member is offered a pro rata share of the settlement amount based on the number of qualifying work weeks as reflected in Defendants' payroll records.  The average class member award is $703 less applicable taxes, withholdings and employee garnishments, and the highest award is $1,640.  (Dkt. No. 97 at ¶ 8.)  Although Plaintiffs might have received more if they proceeded through litigation and prevailed on the merits of their case, they might also receive less and there is a value to the class in obtaining the money now. Given the challenges Plaintiffs would face should this case move forward instead of resolving, in contrast to the finality and speed of recovery under the parties' agreement, this factor weighs in favor of approving the Settlement.

### 2.  Risk of Maintaining Class Action Status Throughout Trial

In considering the third factor, the Court looks to the risk of maintaining class certification if the litigation were to proceed.  Although the parties agree that certification for the purposes of this settlement is appropriate, from the outset of this litigation Defendants have argued that individual issues may defeat certification.  Plaintiff also acknowledges the difficulty and risk of both certification and trial as Plaintiff's off-the-clock and meal period claims are factually complex and difficult to prove in light of the California Supreme Court's decision in *Brinker Restaurant Corp. v. Superior Court (Hohnbaum)*, 53 Cal. 4th 1004 (April 12, 2012).  In addition, if the case proceeded to trial, Plaintiff would incur significant additional costs and attorney time which would deplete any eventual recovery.  In light of these difficulties certifying the class and establishing liability on the merits of Plaintiff's claims, the Court finds that this factor also weighs

in favor of approving the Settlement.

### 3.  Amount Offered in Settlement

The fourth fairness factor, the amount of recovery offered, also favors final approval of the Settlement.  When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness."  *DIRECT TV*, 221 F.R.D. at 527 (citation omitted).  "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial."  *Id.* (collecting cases).

Here, the settlement provides for a settlement fund of $500,000.  Plaintiff estimates Defendants' potential liability to be $3,512,000 for all the claims.  (Dkt. No. 86 at ¶ 18.)  The settlement fund of $500,000 thus equals 10.7 percent of the total potential liability exposure, before any deductions for fees, costs, or incentive awards.  (*Id.*)  Because of the risk, expense, complexity, and likely duration attached to the litigation of these claims, the Court finds that a settlement based on that fraction is fair and reasonable.  *See Stovall-Gusman v. W.W. Granger, Inc.*, No. 13-CV-02540-HSG, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (concluding that a settlement which provided 10 percent of the potential recovery was "within the range of reasonableness in light of the risks and costs of litigation"); *Ma v. Covidien Holding, Inc.*, No. 12–02161, 2014 WL 360196, at *5 (C.D. Cal. Jan. 31, 2014) (finding a settlement worth 9.1% of the total value of the action "within the range of reasonableness"); *Balderas v. Massage Envy Franchising, LLC*, No. 12–cv–06327 NC, 2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014) (granting preliminary approval of a net settlement amount representing 5% of the projected maximum recovery at trial).

### 4.  Extent of Discovery Completed & the Stage of the Proceedings

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).  Rather,

United States District Court
Northern District of California

1   the court's focus is on whether "the parties carefully investigated the claims before reaching a

2   resolution." *Ontiveros*, 303 F.R.D. at 371 (citation omitted).

3         Here, the parties have spent three years litigating these claims which has resulted in

4   numerous motions to remand, dismiss, transfer venue and an appeal to the Ninth Circuit Court of

5   Appeals.[9]  (Dkt. No. 92-3 at ¶¶ 10-16.)   Plaintiff contends that settlement came only after

6   extensive investigation of Plaintiff's facts and theories, including review of "over 426,000 lines of

7   time entries (punch data) for the class, over 42,000 lines of wage data for the class, over 7,400

8   lines of meal period premium data for the class, job descriptions for the various positions in the

9   class, handbooks/manuals containing the relevant policies and procedures, and hundreds of pages

10  of documents that describe the policies and procedures at issue in the litigation (scheduling

11  templates, checklists, reference guides, etc.)."  (*Id*. at ¶ 13.)  The settlement also followed a full-

12  day mediation with a mediator experienced in wage and hour actions.  (*Id*. at ¶ 15.)  On this

13  record, the Court is persuaded that Plaintiff has conducted sufficient discovery to make an

14  informed decision regarding the adequacy of the settlement.  *See In re Omnivision Techs., Inc.*,

15  559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (finding the parties were sufficiently informed about

16  the case prior to settling because they engaged in discovery, took depositions, briefed motions, and

17  participated in mediation). This factor therefore weighs in favor of approval.

18        **5.  Experience and Views of Counsel**

19        The experience and views of counsel also weigh in favor of approving the settlement.

20  Class counsel and counsel for Defendants have substantial experience in class action wage and

21  hour litigation.  In particular, Plaintiff's counsel has litigated numerous wage-and-hour class

22  action cases—including actions alleging failure to provide meal and/or rest periods, and failure to

23  pay wages, provide accurate wage statements, or final wage payments—and is experienced in the

24  field. (Dkt. No. 92-3 at  ¶¶ 7-8 .)  Class counsel believes the settlement properly balances the

25

26  [9] Although counsel contends that it should be credited an additional year of work based on the
    proceedings in the Prior Action in the Central District, the Court declines to do so—that was a
27  separate action.  While counsel correctly posits that it could have abandoned the class allegations
    and filed as an individual action only following the Central District's dismissal, counsel is the one
28  who elected to file in the Central District in the first instance notwithstanding its local rules for
    class actions.

1   monetary exposure that the class stands to gain with the magnitude of risk of continued

2   litigation—at bottom, that the settlement is fair, adequate and reasonable.  (Dkt. No. 92-3 at ¶ 18)

3   The Court is not aware of any evidence to contradict this assertion.  Accordingly, class counsel's

4   endorsement weighs in favor of approving the settlement.  *See, e.g.*, *In re Omnivision*, 559 F.

5   Supp. 2d at 1043 (finding class counsel's recommendation in favor of settlement presumptively

6   reasonable, as counsel demonstrated knowledge about the case and securities litigation in general).

7        **6.   Presence of a Government Participant**

8        Although no government entity is a party to this action, the United States Attorney

9   General, as well as the Attorneys General for the relevant states, were notified of the settlement

10  pursuant to the notice provision of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715.

11  (Dkt. No. 77.)  "Although CAFA does not create an affirmative duty for either state or federal

12  officials to take any action in response to a class action settlement, CAFA presumes that, once put

13  on notice, state or federal officials will raise any concerns that they may have during the normal

14  course of the class action settlement procedures.  *Garner*, 2010 WL 1687832, at *14.  To date, no

15  state or federal official has raised any objection or concern regarding the settlement.

16       **7.   Reaction of the Class Members**

17       Class members' positive reaction to a settlement weighs in favor of settlement approval;

18  "the absence of a large number of objections to a proposed class action settlement raises a strong

19  presumption that the terms of a proposed class settlement [ ] are favorable to the class members."

20  *In re Omnivision*, 559 F. Supp. 2d at 1043 (citation omitted).

21       Defendants provided a class list which identified 931 potential class members.  The

22  settlement administrator mailed notice to all of these individuals and ultimately reported only 17

23  of the notices as undeliverable because it was unable to find a new correct address.  (Dkt. No. 93-1

24  at ¶¶ 12-13; Dkt. No. 97 t ¶ 4.)  As of this date, the Court is not aware of a single class member

25  who has filed an objection to the settlement and only two class members opted out of the

26  settlement.  (Dkt. No. 97 at ¶¶ 9-10.)  The settlement administrator received 401 claim forms

27  which means that 43 percent of the settlement class made claims accounting for 53 percent of the

28  qualifying workweeks.  (*Id*. at ¶¶ 5-8.)  From this, the Court "may appropriately infer that a class

United States District Court
Northern District of California

14

action settlement is fair, adequate, and reasonable when few class members object to it." *Garner*, 2010 WL 1687832, at *14 (internal quotation marks and citation omitted).

### 8. Risk of Collusion

Given that this settlement was reached prior to class certification, the Court must look beyond the *Churchill* factors and examine the settlement for evidence of collusion with an even higher level of scrutiny. *See Bluetooth*, 654 F.3d at 946. The question here is whether the settlement was the result of good faith, arms-length negotiations or fraud and collusion. Two of the three warnings signs that the Ninth Circuit identified arguably are present. However, for the reasons described below, despite those warning signs the Court concludes that there is no collusion between the parties. *See Bluetooth*, 654 F.3d at 950 (noting that upon remand the district court may uphold the settlement notwithstanding the presence of all three of the *Bluetooth* warning signs).

First, the Court compares the payout to the class (actual and expected) to the unopposed claim of fees by class counsel. *See Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011). The settlement agreement provides that Plaintiff is entitled to an award of attorneys' fees in the amount of 33.33 percent of the settlement fund; that is, $166,165. (Dkt. No. 89 at ¶ 18.) The total payout to participating class members is expected to be $282,085. That the class payout is nearly 70 percent more than the fees sought weighs against a finding of collusion. *See, e.g.*, *Ching v. Siemens Indus., Inc.*, No. 11-CV-04838-MEJ, 2014 WL 2926210, at *2 (N.D. Cal. June 27, 2014) (concluding the same with respect to attorneys' fee of $127,500 and a class payout of $249,100.00); *Larsen v. Trader Joe's Co.*, No. 11-CV-05188-WHO, 2014 WL 3404531, at *8 (N.D. Cal. July 11, 2014), appeal dismissed (Nov. 17, 2014) (finding no collusion where the estimated class payout of $1,906,884.75 was more than double plaintiffs' counsel's requested $950,000.00 award).

In addition, the second warning sign—a "clear sailing" provision—is present here: the settlement agreement includes a provision whereby Defendants will not object to Plaintiff's request for fees up to $166,665. (Dkt. No. 89 ¶ 18(a).) "The very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value

15

United States District Court
Northern District of California

to the class." *Bluetooth*, 654 F.3d at 948 (internal quotation marks omitted). "Therefore, when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Id.*

The third warning sign—whether the parties have arranged for fees not awarded to the class to revert to defendants rather than be added to the class fund, *see Bluetooth*, 654 F.3d at 948—is not present here, where the non-reversionary settlement agreement provides that any remaining funds will be redistributed. (*See* Dkt. No. 89 at ¶ 19.)

Notwithstanding the existence of two of the three warning signs, the Court finds that the settlement did not result from, nor was influenced by, collusion. First, the settlement adequately satisfies the class members' claims, which is reflected at least in part by the complete absence of objections to the settlement. Moreover, the Court finds no evidence of explicit collusion here, where, after considerable motion practice, the parties engaged in settlement talks overseen by a neutral mediator before agreeing on this settlement. Considering the scope of litigation and the nature of the negotiations process, the Court is satisfied that the settlement is the product of successful arms-length negotiations. *See Bluetooth*, 654 F.3d at 948 (holding that participation of a mediator is not dispositive, but is "a factor in favor of a finding of non-collusiveness").

\* \* \*

The eight fairness factors suggest that the settlement is fair, adequate and reasonable, the Court is thus satisfied that the settlement was not the result of collusion between the parties, and there are no objections to address. For each of these reasons, the settlement agreement passes muster under Rule 23(e) and final approval is appropriate.

## II.      Motion for Attorneys' Fees, Reimbursement of Costs, and Incentive Award

Next, the Court must determine whether the requested attorneys' fees and expenses, the settlement administrator cost, and the class representative's incentive award are fair and reasonable. Class Counsel seek an award of $166,665 in attorneys' fees, or 33% of the $500,000

common Settlement fund, as well as $20,000 in expenses, and a $7,500 incentive award for the Class Representative.  For the reasons set forth below, the Court grants the request as to the attorneys' fees, the incentive award, and the settlement administration costs, but reduces the costs awarded as set forth below.

## A.    Attorneys' Fee Award

When a negotiated class action settlement includes an award of attorneys' fees, the fee award must be evaluated in the overall context of the settlement.  *Knisley v. Network Assocs.*, 312 F.3d 1123, 1126 (9th Cir. 2002).  At the same time, the court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount."  *Bluetooth*, 654 F.3d at 941; *see also Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328-29 (9th Cir. 1999) ("[T]he district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper.").

The Ninth Circuit has approved two methods of determining attorneys' fees in cases where, as here, the amount of the attorneys' fee award is taken from the common fund set aside for the entire settlement:  the "percentage of the fund" method and the "lodestar" method.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted).  The district court retains discretion in common fund cases to choose either method.  *Id.*  Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion."  *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the court may award class counsel a given percentage of the common fund recovered for the class.  *Id.*  "The percentage method is particularly appropriate in common fund cases[ ] where 'the benefit to the class is easily quantified.'"  *Ontiveros*, 303 F.R.D. 372 (quoting *Bluetooth*, 654 F.3d at 942).  In common fund cases in the Ninth Circuit, the "benchmark" award is 25 percent of the recovery obtained, with 20–30% as the usual range.  *See Vizcaino*, 290 F.3d at 1047.  Because this case involves a common settlement fund with an easily quantifiable benefit to the class, the Court will primarily determine attorneys' fees using the benchmark method but will incorporate a lodestar cross-check to ensure

the reasonableness of the award.  *See Vizcaino*, 290 F.3d at 1047; *see, e.g.*, *Nwabueze v. AT&T, Inc.*, No. C 09-01529 SI, 2014 WL 324262, at *3 (N.D. Cal. Jan. 29, 2014) ("*Nwabueze II*"); *Ontiveros*, 303 F.R.D. at 372 (adopting a common fund benchmark model to determine attorneys' fees but using the lodestar method to cross-check the amount).

In assessing whether the percentage requested is fair and reasonable, courts generally consider the following factors: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work performed; (4) the contingent nature of the fee and the financial burden; and (5) the awards made in similar cases. *Vizcaino*, 290 F.3d at 1047; *Six Mexican Workers v. Az. Citrus Growers*, 904 F.2d 1301 (9th Cir.1990).

### 1. Percentage of the Fund

Class Counsel requests an award of attorneys' fees which amounts to one-third of the total settlement value, or $166,665.  This request is consistent with the Settlement Agreement which provides that counsel may apply for an award of attorneys' fees not to exceed 33 percent of the total settlement amount.  (Dkt. No. 89 at ¶ 18(a).)  Counsel contends that an award over the traditional 25 percent benchmark is appropriate here given the extensive litigation which preceded the settlement, including multiple motions to remand, dismiss and transfer, as well as a Ninth Circuit Appeal.  Counsel also points to the extensive investigation and discovery which required review of thousands of pages of documents, as well as the contingent nature of the litigation.  Finally, counsel points to the fact that the fees sought here represents only 52 percent of their lodestar.

The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award.  *In re Omnivision Technologies, Inc*, 559 F.Supp.2d 1036, 1046 (N.D. Cal. 2008) (citing *In re Heritage Bond Litig.*, 2005 WL 1594403, at *8 (C.D. Cal. June 10, 2005).  Through this Settlement, counsel obtained a nearly $300,000 non-reversionary fund which was available to the 931 class members.  The average recovery for the 401 class members who submitted claims will be over $700.  Given the significant challenges Plaintiff would have faced in maintaining this litigation through class certification and trial, the results achieved in this case are very favorable.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    As to the second factor, as discussed above, the risks associated with this case were

2  substantial given the challenges of obtaining class certification and establishing liability on

3  Plaintiff's wage and hour claims.  (Dkt. No. 92-3 at ¶¶ 17-19.)   The third factor, the skill required

4  and the quality of the work, likewise supports a deviation from the 25 percent benchmark given

5  that this case has survived multiple motions to remand, dismiss, transfer venue, and a Ninth

6  Circuit appeal over the course of its three years of pendency.

7    With respect to the contingent nature of litigation—the fourth factor—courts tend to find

8  above-market-value fee awards more appropriate in this context given the need to encourage

9  counsel to take on contingency-fee cases for plaintiffs who otherwise could not afford to pay

10  hourly fees.  *See, e.g.*, *In re WPPSS Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994).  This is

11  especially true where, as here, class counsel has significant experience in the particular type of

12  litigation at issue; indeed, in such contexts, courts have awarded the 33 percent benchmark

13  percentage sough here.  *See, e.g.*, *In re Heritage Bond Litig.*, 2005 WL 1594403, at *19 (C.D. Cal.

14  June 10, 2005)(awarding attorneys' fees in the amount of 33 percent of the common fund based in

15  part on the effort, skill and experience of class counsel and collecting cases regarding the same).

16  Moreover, when counsel takes cases on a contingency fee basis, and litigation is protracted, the

17  risk of non-payment after years of litigation justifies a significant fee award.  *See id.*  Thus, that

18  class counsel had significant experience in this field and took on this matter on a contingent fee

19  basis indicates that the 25 percent benchmark fee request is reasonable.

20    As to the fifth factor and awards in similar cases, several other courts—including many in

21  this District—have concluded that a 30 percent or higher award was appropriate in wage and hour

22  class actions.  *See, e.g.*, *Willner v. Manpower Inc.*, No. 11-CV-02846-JST, 2015 WL 3863625, at

23  *7 (N.D. Cal. June 22, 2015) (awarding 30 percent of the common fund); *Lusby v. GameStop Inc.*,

24  No. C12-03783 HRL, 2015 WL 1501095, at *4 (N.D. Cal. Mar. 31, 2015) (awarding attorney's

25  fees in the amount of 33 percent of the common fund and collecting cases regarding the same);

26  *Ching v. Siemens Indus., Inc.*, No. 11-CV-04838-MEJ, 2014 WL 2926210, at *8 (N.D. Cal. June

27  27, 2014) (awarding 30 percent of the common fund); *Burden v. SelectQuote Ins. Servs.*, No. C

28  10-5966 LB, 2013 WL 3988771, at *5 (N.D. Cal. Aug. 2, 2013) (awarding 33 percent of the

common fund); *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 450 (E.D. Cal. 2013) (awarding 33 percent of the common fund and collecting cases regarding the same).

Finally, the Court also notes that the lack of objection by any members of the class also supports the fee award. *See Omnivision*, 559 F.Supp.2d at 1048 (N.D. Cal. 2008) (finding factor favored approval where no objections to fee where raised in response to 57,630 copies of notice being sent).

**2.    Lodestar Crosscheck**

The Ninth Circuit encourages district courts "to guard against an unreasonable result" by cross-checking attorneys' fees calculations against a second method. *In re Bluetooth*, 654 F.3d at 944. "The 'lodestar' is calculated by multiplying the number of hours . . . reasonably expended on the litigation by a reasonable hourly rate." *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996). "Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." *Thayer v. Wells Fargo Bank, N.A.*, 92 Cal. App. 4th 819, 833 (2001) (citation omitted).

| Attorney | Hours | Rate | Lodestar |
| --- | --- | --- | --- |
| Roger R. Carter | 45.70 | $700 | $31,990 |
| Scott B. Cooper | 186.4 | 700 | $130,480 |
| Marc H. Phelps | 337.8 | 500 | $168,900 |
| Bianca A. Sofonio | 28.6 | $450 | $12,870 |
| **Total** | **598.5** | | **$344,240** |

(Dkt. No. 92-3 at 10.)

"In determining the reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986), *amended on other grounds by* 808 F.2d 1373 (9th Cir. 1987). The relevant community for

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the purposes of determining the prevailing market rate is generally the "forum in which the district

2   court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).  In addition to

3   affidavits from the fee applicant himself, other evidence of prevailing market rates may include

4   affidavits from other area attorneys or examples of rates awarded to counsel in previous cases.

5   *See Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1167 (N.D. Cal. 2012) (citation omitted).

6   Class counsel's hourly rates were recently approved in *Schneider v. Space System/Loral, Inc.*, No.

7   11-2489-MMC, Dkt. No. 80 (N.D. Cal. Jan. 28, 2014).[10]  The Court thus concludes that counsels'

8   rates here are likewise reasonable.

9        As to the number of hours billed, they must equal the number of hours that can reasonably

10   be billed to a private client.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

11   Thus, the court should only award fees based on "the number of hours reasonably expended on the

12   litigation" and should exclude "hours that are excessive, redundant, or otherwise unnecessary."

13    *Hensley*, 461 U.S. at 433-34.  "There is no precise rule or formula for making these

14   determinations[,]" and "[t]he court necessarily has discretion in making this equitable judgment."

15   *Id.* at 436-37.

16        Here, class counsel's time records reflect more than 500 hours of work performed on this

17   case for a total of $344,240 in legal fees.  This represents a negative multiplier of .48; that is, class

18   counsel seeks 48 percent of their lodestar.  While the Court does not believe that counsel is

19   entitled to recover fees for work done prior to the filing of the underlying action in the Alameda

20   County Superior Court, the time billed for the work preceding filing suit in November 2012

21   represents just a fraction of the total time counsel seeks to recover (69.4 hours); indeed, it would

22   only reduce the total lodestar by $37,866.

23        The Court also notes two other areas of concern with respect to class counsel's billing

24   records: block billing for travel time and billing for work done in the Superior Court following

25   remand.  First, counsel consistently bills large blocks of time for travel from Irvine to San

26

27   _____

[10] Mr. Cooper's rate was $650 at that time, rather than the $700 sought here.  However, his increased rate has twice been approved since.  *See Parra et al v. Aero Port Services, Inc.*, Case

28   No. BC483451 (Los Angeles Superior Court, April 2015); *O'Brien et al. v. Pizza Hut of Southeast Kansas, Inc., et al.*, Case No. MCC 1301030 (Riverside Superior Court, March 2015).

United States District Court
Northern District of California

Francisco to attend hearings which is unreasonable as counsel was presumably working on other matters or could have been during much of this time.  (*See, e.g.*, Dkt. No. 92-3 at 15 (billing 9 hours for a hearing on May 2, 2013), 19 (billing 9 hours for a hearing on June 4, 2015; Dkt. No. 92-2 at 20 (billing 10.6 hours for traveling to a hearing on May 2, 2013), 20 (billing 8.3 hours for attending hearing on motion to stay and demurrer), 13 (billing 9.7 hours to attend and prepare for a hearing on April 24, 2014, as well as 4.8 hours the day before to prepare for the hearing).  Second, counsel seeks fees for work done following this Court's remand order and while the case was pending before the Alameda Superior Court.  The Ninth Circuit ultimately vacated and remanded this Court's remand order based on an intervening change in the law; class counsel, however, opposed Defendants' request to stay proceedings in the Superior Court during the pendency of the appeal notwithstanding that the Ninth Circuit was considering a casel, *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975 (9th Cir. 2013), regarding the dispositive issue in the remand Order.[11]  The Court thus questions whether the 29 hours incurred for work done before the Superior Court from May 2013 to October 2013 is recoverable.  (Dkt. Nos. 92-3 at 16; Dkt. No. 92-2 at 11.)  However, even if the Court were to strike all this time, it would still not result in a reduction in the lodestar that is anywhere as great as the 52 percent reduction Class Counsel has already made to their lodestar in seeking a recovery of $166,665.

* * *

Thus, while the Court expressed concern at the preliminary approval stage regarding awarding fees beyond the 25 percent benchmark, the Court is persuaded that it is fair and reasonable to do so under the facts of this case.  Counsel's motion for attorneys' fees is therefore granted.

**B.**     **Expenses**

Plaintiff seeks to recover $20,000 in costs.[12]  The Court finds that the request for costs is

---

[11] Also, as an appeal under the Class Action Fairness Act, both the appeal of this Court's remand Order and *Rodriguez* were required to be decided by the Court of Appeals within 60 days of filing—far quicker than the typical appellate turn-around time.  *See* 28 U.S.C. § 1453(c)(2).
[12] As of the filing of the motion, the costs incurred were $19,701.27, but counsel estimated at least another $300 in costs prior to final approval.

United States District Court
Northern District of California

1    generally reasonable, however, the Court notes a few areas of concern.  First, as with the request

2    for attorneys' fees, any request for costs predating the filing of the complaint here; that is, the

3    complaint that was filed with the Alameda County Superior Court on November 19, 2012, are not

4    recoverable. (Dkt. No. 1-1 at 27.)  Accordingly, the Court strikes $1,409.25 in costs for expenses

5    incurred before this date and related to the prior action in the Central District of California.  (Dkt.

6    No. 92-2 at 20 (Cooper Law Firm's request for $96.50 in costs between 4/25/12 and 6/15/12); Dkt.

7    No. 92-1 at 14-15 (Carter Law Firm's request for $1,312.75 in costs between 5/6/11 and 7/6/12).)

8            Second, Mr. Cooper seeks to recover travel costs for a hearing in August 2013 that did not

9    take place before this Court; this is presumably associated with traveling to oppose Defendants'

10   motion to stay proceedings in the Alameda County Superior Court during the pendency of the

11   Ninth Circuit appeal, although no such explanation is provided.[13]  (DKt. No. 92-2 at 20 (seeking

12   $527.59 for travel costs on August 26, 2013).)   For the same reasons the Court would strike any

13   fees associated with opposing this stay motion, the Court strikes the cost request associated with

14   this motion.

15           Accordingly, the Court deducts a total of $1,936.84 from the costs sought and awards

16   $18,264.43 in costs.[14]  The remaining funds shall be redistributed amongst the class members in

17   pro rata shares according to the previously agreed upon calculation of class member shares.

18       **C.    Incentive Award**

19           "[N]amed plaintiffs, as opposed to designated class members who are not named

20   plaintiffs, are eligible for reasonable incentive payments." *Staton v. Boeing Co*., 327 F.3d 938

21   (9th Cir. 2003).  To determine the appropriateness of incentive awards a district court should use

22   "relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class,

23   the degree to which the class has benefitted from those actions ... the amount of time and effort

24   the plaintiff expended in pursuing the litigation ... and reasonabl[e] fear[s of] workplace

25   retaliation." *Id.*  In this district, a $5,000 payment is presumptively reasonable.  *See, e.g.*, *Burden*

26

27   [13] This action was terminated upon remand in May 2013 and no further activity occurred in this
     case until October 2013 following Defendants' removal of the case again to this Court and motion

28   to relate the removed action with this original case.
     [14] This assumes travel costs of $500 for attending the Final Approval hearing.

*v. SelectQuote Ins. Servs.*, No. C 10-5966 LB, 2013 WL 3988771, at *6 (N.D. Cal. Aug. 2, 2013); *Hopson v. Hanesbrands, Inc.*, No. CV-08-0844, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009).  Incentive awards typically range from $2,000 to $10,000.  *See, e.g.*, *Covillo v. Specialtys Cafe*, No. C-11-00594 DMR, 2014 WL 954516, at *8 (N.D. Cal. Mar. 6, 2014) (ordering an $8,000 incentive award for each of the three named plaintiffs); *Wolph v. Acer Am. Corp.*, No. 09-01314 JSW, 2013 WL 5718449, at *6 (N.D. Cal. Oct. 21, 2013) (ordering a $2,000 incentive award for each named plaintiff); *Chu v. Wells Fargo Invs., LLC*, Nos. C 05-4526 MHP, C 06-7924 MHP, 2011 WL 672645, at *5 (N.D. Cal. Feb. 16, 2011) (awarding a $10,000 incentive award to two named plaintiffs).

Here, Plaintiff seeks an award of $7,500 as compensation for her efforts on behalf of the class and for a personal release of her claims.  Plaintiff submitted a declaration attesting to expending numerous hours "staying in touch with her attorneys and fellow class members; b) speaking on the phone with them, as well as composing and reading numerous email exchanges; c) locating and organizing documents for the case; d) reviewing paperwork sent to me by my attorneys and having to respond to informal discovery questions."  (Dkt. No. 92-4 at ¶ 18.) Further, Plaintiff attests that she took on the responsibilities as a representative plaintiff despite the risks of possible stigma and responsibility for the legal costs should the case have been unsuccessful because she felt Defendant's policies were "unjust and wrong" and she wanted to "stand up for what I believed was right."  (*Id*. at ¶ 10.)

Having reviewed Plaintiff's declaration and that of class counsel, the court concludes that an award of $7,500 is reasonable in light of the time and effort Plaintiffs expended for the benefit of the class and the risks associated with initiating the litigation and representing the class, and because the settlement included a broad personal release of all of her potential claims.  (Dkt. No. 92-4; Dkt. No. 92-3 at ¶ 34; Dkt. No. 89 at ¶ 16.)  Further, the award is particularly appropriate in this wage and hour class action, where Plaintiff undertook a significant "reputational risk" in bringing this action against her former employer.  *See Rodriguez*, 563 F.3d at 958–59.

### D.  Administration Costs

The settlement agreement also allocated $20,000 in settlement administration costs.  (Dkt.

United States District Court
Northern District of California

No. 89 at ¶ 18(d).)  The parties selected Rust Consulting, Inc., as the claims administrator and its duties included: "a) preparing, printing, and e-mailing (to currently employed Class Members) and mailing to all Class Members the Notice of Class Action Settlement ("Notice") and Claim Form ("Claim Form") (collectively known as the "Class Notice"); b) receiving and reviewing Claim Forms submitted by Class Members; c) tracking of requests for exclusion; [and] d) drafting and mailing Settlement Award checks to Class Members."  (Dkt. No. 93-1 at ¶ 3.) The total cost of settlement administration is estimated to be $20,000.  (*Id.* at ¶ 20 & Ex. D.)  Courts regularly award administrative costs associated with providing notice to the class.  *See, e.g.*, *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015).  The Court therefore concludes that Rust's costs were reasonably incurred for the benefit of the class and awards the full amount.

## CONCLUSION

For the reasons described above, the Court GRANTS Plaintiff's motion for final approval of the parties' Settlement.  In addition, the Court GRANTS IN PART Plaintiff's motion for attorneys' fees, costs, and incentive award.  Specifically, the Court awards the following costs: $166,655 in attorneys' fees; $18,264.43 in litigation costs; $20,000 to the settlement administrator, Rust Consulting; and $7,500 to Plaintiff as class representative.

The Clerk is directed to close this case.

This Order disposes of Docket Numbers 77 and 80.

**IT IS SO ORDERED.**

Dated:  December 11, 2015

Jacqueline Scott Corley

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California